**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ARTHUR BURNHAM,
Plaintiff,

v.

UMASS MEMORIAL MEDICAL CENTER, INC., and THE COMMONWEALTH OF MASSACHUSETTS, acting through the Massachusetts Trial Court, Worcester Probate and Family Court, and Registry, Defendants.

Civil Action No. 4:26-cv-40002-MRG (Leave to file granted at ECF No. 47)

# VERIFIED FOURTH AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF (JURY TRIAL DEMANDED)

## I. INTRODUCTION

**1.** This is a civil-rights action arising from two related but legally distinct alleged failures of disability access. Plaintiff alleges that Defendant UMass Memorial Medical Center, Inc. denied reasonable disability-related modifications and meaningful access to covered inpatient mobility, Physical Therapy/DME, care-coordination, discharge-planning, and psychiatric-placement services, and thereafter retaliated against Plaintiff for protected disability-rights advocacy. Plaintiff separately alleges that Defendant Commonwealth of Massachusetts, acting through the Massachusetts Trial Court, Worcester Probate and Family Court, and Registry, failed to provide meaningful and disability-accessible access to filing, exhibit-intake, docketing, record-maintenance, counsel-status, and reasonable-modification services while Plaintiff defended an active guardianship proceeding.

**2.** Plaintiff's allegations are supported by contemporaneous medical records, physician and Social Work notes, a Rapid Response record, a contemporaneous psychiatric assessment, records of psychiatric-placement efforts, two separately documented physical courthouse deliveries, commercial shipment records, the physically delivered Probate Opposition and

supporting exhibit record, eFileMA rejection notices, written disability-accommodation requests, appointed counsel's written declination, Registry RECEIVED and FILED stamps, attorney correspondence with Worcester Probate personnel, the official Probate docket, an official Commonwealth funding record, and preservation requests identifying material Probate hearing recordings. Plaintiff relies upon documentary evidence for the facts those documents establish and upon verified firsthand recollection and reasonable inference for matters not established by the documents themselves.

**3.** UMass's March 2025 records document that Plaintiff's inpatient psychiatric-bed search was "Complicated by medical; paraplegia" and later by "medical complexities; paraplegia with motorized wheelchair, chronic cath," while Unit 8E separately declined Plaintiff due to acuity. Plaintiff does not allege that these records establish that Unit 8E expressly excluded him solely because he was paraplegic. He alleges that they document that his disability-related medical complexity and motorized-wheelchair dependence were expressly affecting the psychiatric-placement process. (**Exhibits 4-6**.)

**4.** During Plaintiff's Fall 2025 admission, his powered wheelchair became nonfunctional. UMass documented administrative and insurance restrictions under which repair or replacement would occur only after discharge or could not be done while Plaintiff remained an inpatient. Plaintiff repeatedly requested a PT/DME evaluation and alleges that he also requested an effective standard wheelchair. On December 4, a UMass physician documented Plaintiff's continuing PT request and his report that **"the transport chair he received does not work."** Plaintiff alleges that he therefore remained without an effective mobility accommodation while the wheelchair and discharge dispute continued. (**Exhibits 10-12**; **Supplemental Exhibits 1-2**.)

**5.** On December 7, 2025, during that unresolved mobility and disposition dispute, Plaintiff sustained a severe self-inflicted arm injury requiring emergency intervention. The

critical-care record states that clinicians managed **"life threatening blood loss and/or hemorrhagic shock so as to prevent death."** On December 8, psychiatrist Dr. Robin Stern documented Plaintiff's dependence upon his motorized wheelchair, his stated concern that he would have no independence without it, and his refusal to leave before it was fixed, while contemporaneously concluding that he did not require inpatient psychiatric level of care and that the event **"was not a suicide attempt."** **(Supplemental Exhibit - RR; Exhibit 19.)**

**6.** By December 22, UMass was conducting a psychiatric-bed search that included referrals to UMass psychiatric units. Social Work expressly identified the barriers as "disposition, Wheelchair issue, and behaviors." Plaintiff alleges that this record directly establishes that the unresolved wheelchair issue was operating as one barrier in the psychiatric-placement process; Plaintiff does not allege that the wheelchair was the sole reason for non-placement. **(Exhibit 17.)**

**7.** A separate December 22 capacity record incorporated Plaintiff's expectations concerning "insurance coverage for DME supplies, wheelchair repair etc." immediately before stating that a substituted decision maker would be helpful and recording that guardianship paperwork had been completed. Plaintiff alleges that this constitutes direct documentary linkage between the subject matter of his disability advocacy and UMass's substituted-decision-maker and guardianship decision-making process, while recognizing that ultimate retaliatory motive remains an inference from the complete record. **(Exhibit 15.)**

**8.** Plaintiff filed this federal civil-rights action on January 5, 2026. UMass-affiliated hospital counsel formally commenced the Probate guardianship proceeding on January 7. Plaintiff does not allege that the January 5 action caused UMass to conceive of guardianship for the first time, because the December 22 record establishes earlier guardianship planning. Plaintiff instead alleges that his preexisting disability-accommodation advocacy was a but-for cause of the

guardianship effort in the manner alleged and that the January 5 federal action constituted additional protected activity immediately preceding UMass's formal commencement and continued pursuit of that proceeding. (**Exhibit 15**; **Registry Exhibit P**.)

**9.** Plaintiff further alleges from firsthand recollection that, during the March 17, 2026 Probate hearing, Dr. Stern characterized the December 7 event as a serious suicide attempt despite her December 8 contemporaneous record stating that it **"was not a suicide attempt."** Plaintiff has requested preservation of the complete March 17 recording so that the precise testimony can be established from the official audio. The preservation request establishes the identified hearing date and preservation demand; it does not itself prove the content of the testimony. (**Exhibit 19**; **Supplemental Exhibit - March 17 Audio Preservation Request**.)

**10.** During the same guardianship proceeding, Plaintiff attempted to place before the Probate Court a substantive Opposition and supporting medical evidence that included **Exhibit 15** and other records concerning the DME/wheelchair dispute, psychiatric condition, decision-making, guardianship timing, and less restrictive alternatives. UPS records establish one Probate delivery to the Worcester courthouse mailroom on January 16 and a separately documented second Probate delivery on January 23. Plaintiff alleges that neither physical delivery produced a complete identifiable contemporaneous processing record corresponding to the package on the presently available Probate docket. (**Registry Exhibits A, B, D, and P**.)

**11.** After the physical route failed to provide a reliable working record, Plaintiff attempted electronic submission and expressly requested individualized disability-related filing modifications. His written accommodation request informed the Court that he was paraplegic, hospitalized and physically confined, lacked access to printers, copying services, and postal mail, and proposed multiple alternatives for filing supporting evidence. The accommodation request was denied in connection with appointment of counsel; the appointed lawyer declined the

following day; and during the resulting counsel gap Plaintiff's own emergency submission was rejected because **"counsel must file."** **(Registry Exhibits F-K.)**

**12.** The subsequent documentary sequence includes separate Registry RECEIVED and FILED stamps on counsel's declination, Plaintiff's effort to clarify who represented him, a later instruction to **"file by mail or in person"** after the Commonwealth had received particularized notice concerning his inability to reliably use those methods, and Worcester Probate's February 19 statement that counsel's declination did not appear to have been processed. Plaintiff further alleges from firsthand recollection that successor counsel later discussed counsel-status or appointment information that appeared differently between her reviews of the docket. Plaintiff does not allege that these facts presently establish who made any docket change, why any information appeared differently, or that Registry personnel shared UMass's alleged motive. **(Registry Exhibits C, L-O, and P.)**

**13.** Plaintiff alleges a completed disability-access injury while the guardianship remained active: not that he was entirely prevented from speaking in court, but that he lacked a reliable disability-accessible mechanism to create, complete, and preserve an identifiable working court record of material opposition evidence and emergency filings in a proceeding affecting his liberty, autonomy, medical decision-making, discharge, and placement. Plaintiff does not ask this Court to review or reverse a Probate judgment. He challenges independent administrative access barriers and alleges that the later termination or dismissal of the guardianship did not retroactively cure completed federal injuries.

## II. JURISDICTION AND VENUE

**14.** This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

**15.** Plaintiff's claims arise under Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, and related federal civil-rights law.

**16.** Defendant Commonwealth of Massachusetts is not immune from Plaintiff's Title II claim insofar as that claim concerns meaningful access to state judicial services and proceedings. Title II validly abrogates state sovereign immunity as applied to the class of cases implicating the fundamental right of access to the courts. Tennessee v. Lane, 541 U.S. 509 (2004). Plaintiff separately pleads Section 504 to the extent the relevant Massachusetts Trial Court program or activity receives federal financial assistance, subject to 42 U.S.C. § 2000d-7.

**17.** Venue is proper in the District of Massachusetts because the events, omissions, and injuries giving rise to these claims occurred in Worcester, Massachusetts.

## III. PARTIES

**18.** Plaintiff Arthur Burnham is an adult resident of Massachusetts and a qualified individual with a disability within the meaning of the ADA and Section 504.

**19.** Defendant UMass Memorial Medical Center, Inc. is a Massachusetts health-care corporation operating hospitals and inpatient units. Plaintiff alleges that UMass receives federal financial assistance, including Medicare and Medicaid/MassHealth funds, and is subject to Section 504.

**20.** Defendant Commonwealth of Massachusetts, acting through the Massachusetts Trial Court, Worcester Probate and Family Court, and Registry, is a public entity within the meaning of Title II of the ADA. The Registry's administrative functions include filing intake, docketing, exhibit processing, eFileMA review, counsel-status processing, record maintenance, and processing requests for reasonable accommodations.

## IV. JUDGE-FACING EXHIBIT ANCHORS

**21.** To assist the Court in evaluating plausibility and identifying the documentary basis for the allegations, Plaintiff provides the following exhibit anchors. The UMass exhibits document the mobility, accommodation, psychiatric-placement, guardianship, and retaliation sequence. The Registry exhibits document the material defense record Plaintiff attempted to establish, his physical and electronic filing efforts, particularized disability-related accommodation requests, counsel-status barriers, official docket chronology, and the federal-financial-assistance predicate for the parallel Section 504 claim. These anchor descriptions are navigational summaries only; the underlying exhibits control.

### A. UMass Exhibit Anchors

| EXHIBIT | DATE | DOCUMENT / RECORD | JUDGE-FACING RELEVANCE |
|---|---|---|---|
| **Exhibits 1-3** | Aug.-Dec. 2024 | Emergency/medical records and injury evidence | Establish early UMass notice that Plaintiff's wheelchair circumstances created serious physical-injury risk and that safer wheelchair equipment was needed. |
| **Exhibits 4-6** | Mar. 2025 | Psychiatric-placement / clinical progress records | Document that inpatient psychiatric-bed placement was complicated by medical issues, paraplegia, and motorized-wheelchair dependence, while Unit 8E separately declined for acuity. Offered to establish disability-related placement context, not that paraplegia was the sole basis for the 8E decline. |
| **Exhibit 7** | 03/10/2025 | Wound Ostomy Continence RN consultation | Corroborates recurring lower-extremity wounds associated with wheelchair trauma and dragging of Plaintiff's legs or feet against wheelchair components. |
| **Exhibit 10** | 10/08/2025 | Hospital medicine progress note | Documents Plaintiff's request for wheelchair assistance/replacement and UMass's knowledge that the existing chair did not hold his legs. |
| **Exhibit 11** | 11/20/2025 | Internal-medicine progress note | Documents the insurance/outpatient restriction under which wheelchair repair or prescription was said to require discharge and outpatient processing. |

| EXHIBIT | DATE | DOCUMENT / RECORD | JUDGE-FACING RELEVANCE |
|---|---|---|---|
| **Exhibit 12** | 11/24/2025 | Plan of Care / Social Work record | Documents Plaintiff's community-discharge objective, need for functioning electric-wheelchair mobility, request for PT evaluation, and the statement that repair/replacement "cannot be done while inpt at UMass." |
| **Supplemental Exhibit 2** | 11/29/2025 | Dr. Yaniv progress note | Documents physician-level notice that Plaintiff requested PT specifically so his motorized wheelchair could be repaired while wheelchair and disposition planning remained unresolved. |
| **Exhibit 13** | 12/02/2025 | Multidisciplinary disposition record | Documents institution-level participation by Risk Management, Office of General Counsel, management, and other personnel while the wheelchair/DME/disposition dispute remained unresolved. Offered as evidence of institutional awareness, not motive standing alone. |
| **Supplemental Exhibit 1** | 12/04/2025 | Dr. Velten progress note | Documents continuing PT request and Plaintiff's report that "the transport chair he received does not work," together with ongoing placement and motorized-wheelchair discussions. |
| **Supplemental Exhibit - RR** | 12/07/2025 | Rapid Response / critical-care record | Documents severe self-inflicted arm trauma and emergency treatment; critical-care documentation states clinicians managed "life threatening blood loss and/or hemorrhagic shock." Offered to establish objective severity and chronology; causation remains to be proven. |
| **Exhibit 19** | 12/08/2025 | Dr. Stern behavioral-health assessment | Directly connects the psychiatric assessment to Plaintiff's motorized wheelchair, independence, discharge and placement dispute and states contemporaneously, "This was not a suicide attempt." Provides the baseline against which Plaintiff alleges later testimony should be compared; does not alone establish falsification. |
| **Exhibit 17** | 12/22/2025 | Social Work psychiatric-bed-search record | Documents active psychiatric-placement efforts, including UMass psychiatric referrals, and expressly identifies the barriers as "disposition, Wheelchair issue, and behaviors." Supports the psychiatric-placement disability-access theory without alleging the wheelchair was the sole barrier. |

| EXHIBIT | DATE | DOCUMENT / RECORD | JUDGE-FACING RELEVANCE |
| --- | --- | --- | --- |
| **Exhibit 15** | 12/22/2025 | Psychiatry decision-making-capacity note | Documents DME supplies, wheelchair repair and insurance expectations immediately before discussion of a substituted decision maker and completion of guardianship paperwork; central documentary linkage for the retaliation theory. |
| **Supplemental Exhibit - March 17 Audio** | 03/17/2026 hearing | Probate hearing audio preservation request | Identifies March 17 as the relevant hearing and seeks preservation of the official recording that Plaintiff alleges contains Dr. Stern's later characterization of the December 7 event. The request proves preservation and identification, not the testimony itself. |

## B. Registry Exhibit Anchors

| EXHIBIT | DATE | DOCUMENT / RECORD | JUDGE-FACING RELEVANCE |
| --- | --- | --- | --- |
| **Registry A** | Jan. 15-16, 2026 | UPS email, shipment records, Probate proof of delivery, federal comparison | Establishes delivery of the Opposition package to the Worcester courthouse mailroom January 16 at 10:45 a.m., "Received By: KEN," and separately documents the federal filing transmitted through the same service and docketed later that day. Offered to establish transmission and courthouse receipt, not motive. |
| **Registry B** | Jan. 2026 | Opposition to Temporary Guardianship and supporting exhibit record | Establishes what Plaintiff was attempting to place into the Probate record: material defense evidence concerning capacity, DME/wheelchair issues, psychiatric condition, guardianship timing and less restrictive alternatives, including Exhibit 15. |
| **Registry C** | Jan. 20 & Mar. 31, 2026 | Hearing-audio preservation requests | Identifies and seeks preservation of the January 20 and March 31 hearings that Plaintiff alleges concern handling of his Opposition/Exhibit 15 and successor counsel's later counsel-status observations. Preservation requests prove identification and preservation demands, not hearing contents. |

| EXHIBIT | DATE | DOCUMENT / RECORD | JUDGE-FACING RELEVANCE |
|---|---|---|---|
| Registry D | Jan. 22-23, 2026 | UPS assembly instructions, shipment receipt and recovered historical tracking | Establishes a second separate physical filing attempt: contemporaneous instructions identify one Probate "COURT COPY" containing five specified filings and historical UPS data confirms courthouse delivery January 23 at 11:34 a.m. |
| Registry E | 01/23/2026 | Email service to UMass counsel and receipt acknowledgment | Independently corroborates that Plaintiff's Opposition, judge-facing exhibit table and supporting exhibits existed and were transmitted during the relevant period; opposing counsel acknowledged receipt. |
| Registry F | 01/27/2026 | eFileMA rejection notices | Documents electronic filing attempts after physical-filing problems and administrative rejection under a one-envelope requirement. |
| Registry G | 01/28/2026 | eFileMA exhibit rejection | Documents the electronic exhibit-intake barrier when Plaintiff attempted to submit supporting exhibits necessary to complete the Probate defense record. |
| Registry H | Jan. 28 / Feb. 4 / Feb. 17, 2026 | ADA/Section 504 accommodation motion, denial and renewed request | Provides particularized written notice of Plaintiff's disability-related filing limitations, identifies multiple proposed alternative filing methods, documents denial in connection with appointment of counsel, and documents renewed notice after that alternative failed. |
| Registry I | 02/05/2026 | Attorney House cover letter / declination | Establishes that the attorney appointed as the proposed alternative filing route declined the following day, requested replacement counsel and asked the Probate Court to file his declination. |
| Registry J | 02/06/2026 | Massachusetts Appeals Court counsel-status order | Documents that counsel appointment/status was under appellate attention during the same period in which Plaintiff alleges the disability-access filing problem remained unresolved. |
| Registry K | 02/09/2026 | eFileMA rejection | Documents rejection of Plaintiff's pro se emergency submission with the clerk comment "counsel must file" during the alleged nonfunctioning-counsel gap. |
| Registry L | Feb. 9 & 13, 2026 | House declination with Registry RECEIVED / FILED stamps | Establishes a RECEIVED stamp dated February 9 at 11:29 a.m. and a separate FILED stamp dated February 13; supports inquiry into when the declination became operational for filing-review and representation-status purposes. |

| EXHIBIT | DATE | DOCUMENT / RECORD | JUDGE-FACING RELEVANCE |
|---|---|---|---|
| **Registry M** | 02/16/2026 | Motion for Clarification of Counsel Status | Establishes that Plaintiff affirmatively attempted to determine who represented him, whether counsel had accepted/appeared, and who could file on his behalf. |
| **Registry N** | Feb. 17-18, 2026 | eFileMA rejection of counsel-status motion | Documents rejection with the instruction "efile down please file by mail or in person" after Plaintiff had provided disability-related notice concerning his inability to reliably use conventional filing methods. |
| **Registry O** | 02/19/2026; obtained Aug. 2026 | House / Worcester Probate correspondence | Newly obtained first-hand attorney evidence. House stated his notes reflected mailing his declination February 5; Worcester Probate responded that the Registry did not appear to have processed it and offered to expedite the matter. |
| **Registry P** | 2026 | Official Worcester Probate docket | Provides the official chronology against which the two physical deliveries, later filings, appointment/termination information, and counsel-status processing allegations are compared; supports discovery into the absence or timing of corresponding processing entries. |
| **Registry Q** | FY2026 | Official Massachusetts Trial Court enacted budget | Official public record supporting the pleaded federal-financial-assistance predicate for the Massachusetts Trial Court program or activity and the parallel Section 504 theory. |

# V. FACTUAL ALLEGATIONS

## A. Defendant UMass Memorial Medical Center

**22.** Plaintiff Arthur Burnham is a paraplegic from the chest down. He is substantially limited in major life activities and depends upon functioning wheelchair mobility for movement, safety, independence, self-care, and meaningful community access.

**23.** Defendant UMass Memorial Medical Center, Inc. receives federal financial assistance and is subject to Section 504 of the Rehabilitation Act and its implementing regulations. Plaintiff alleges that UMass was required to provide nondiscriminatory and meaningful access to covered inpatient services and to make reasonable modifications to policies, practices, or procedures when necessary to avoid disability discrimination unless the requested modification would fundamentally alter the relevant program or activity.

**24.** Plaintiff does not allege that Section 504 categorically required UMass to purchase, repair, or replace every personally owned wheelchair. Plaintiff alleges that, because of his paralysis and dependence upon wheelchair mobility, UMass was required to make an individualized modification or provide another effective accommodation when its ordinary procedures left him without meaningful mobility and without effective access to covered inpatient, Physical Therapy/DME, care-coordination, discharge-planning, and related services.

**25.** UMass had longstanding actual notice that unsafe or ineffective wheelchair equipment presented a serious risk of physical injury to Plaintiff. On August 2, 2024, UMass documented that Plaintiff's foot had been dragged beneath his wheelchair and injured. (**Exhibit 1**.)

**26.** UMass records document severe and recurring wheelchair-related lower-extremity injury, including exposed bone, surgical treatment and resulting amputation, and later lower-extremity wounds associated with wheelchair trauma and with Plaintiff's legs or feet dragging

against wheelchair components. Plaintiff alleges that these records provided UMass actual notice that unsafe and ineffective mobility equipment posed a serious and recurring risk of physical harm. (**Exhibits 1-3 and 7**.)

**27.** On December 27, 2024, UMass treating physician Dr. Aida Taku expressly documented that Plaintiff required a **"better wheelchair to minimize damage to his feet."** Plaintiff alleges that this provided physician-level notice that safer and more effective wheelchair equipment was medically significant to preventing recurrent injury. (**Exhibit 3**.)

**28.** UMass's March 2025 records also document that Plaintiff's disability-related medical circumstances were affecting psychiatric placement. A March 5 record states that the inpatient psychiatric-bed search was "Complicated by medical; paraplegia" and that Unit 8E declined Plaintiff due to acuity. A March 6 record describes the psychiatric-bed search as complicated by "medical complexities; paraplegia with motorized wheelchair, chronic cath." Plaintiff does not allege that these records prove that Unit 8E expressly declined him solely because of paraplegia. He alleges that the records establish that his paraplegia, medical complexity, and motorized-wheelchair dependence were expressly affecting the psychiatric-placement process. (**Exhibits 4-6**.)

**29.** During Plaintiff's Fall 2025 inpatient admission, his powered wheelchair became nonfunctional because of battery and mechanical problems. Because Plaintiff cannot ambulate independently, loss of the powered wheelchair substantially impaired his ability to move independently within or leave the hospital.

**30.** On October 8, 2025, UMass documented Plaintiff's request for wheelchair repair or replacement and documented that his existing wheelchair did not adequately hold his legs. Plaintiff alleges that this gave UMass additional actual notice that the chair was not merely inconvenient but ineffective and unsafe for his disability-related needs. (**Exhibit 10**.)

**31.** On November 20, 2025, a UMass physician documented that wheelchair repair or prescription would have to occur after discharge because **"insurance only pays when seen as outpatient."** Plaintiff alleges that this documented an administrative or coverage-related restriction rather than an individualized determination that a mobility modification was medically inappropriate or unreasonable. **(Exhibit 11.)**

**32.** On November 24, 2025, Social Work documented that Plaintiff wanted discharge to the community and required a functioning electric wheelchair to accomplish that discharge safely. The record states that repair or replacement would occur in the community and **"cannot be done while inpt at UMass."** Plaintiff continued requesting a Physical Therapy evaluation to establish medical necessity and begin the wheelchair process while hospitalized, requested that UMass put its position in writing, and caused the matter to be elevated to Social Work management. **(Exhibit 12.)**

**33.** Plaintiff alleges that this created a circular disability-access barrier. UMass maintained that his powered wheelchair could not be repaired or replaced while he was an inpatient and instead would have to be addressed after community discharge, while Plaintiff required functioning wheelchair mobility in order to discharge safely and function in the community. **(Exhibit 12.)**

**34.** Plaintiff further alleges from personal knowledge that, when UMass would not repair his powered wheelchair, he asked for a basic manual or standard hospital wheelchair so that he could get out of bed, move within the hospital, communicate directly with Social Work and Case Management, and leave the hospital if otherwise medically permitted. Plaintiff alleges that a floor manager acknowledged that such a wheelchair was available and could be obtained from another floor, but an effective standard wheelchair was nevertheless not provided. This allegation was also contained in Plaintiff's Third Amended Complaint.

**35.** On November 29, 2025, Dr. Benyamin Yaniv documented that Plaintiff requested a PT evaluation specifically so that he could get his motorized/electric wheelchair repaired. The same record documents continuing Case Management and Social Work planning concerning the wheelchair and long-term-care issues. **(Supplemental Exhibit 2.)**

**36.** On December 2, 2025, while the wheelchair and disposition dispute remained unresolved, UMass documented multidisciplinary disposition planning involving Risk Management, the Office of General Counsel, management, and hospital personnel. Plaintiff relies upon this record as evidence that the unresolved disposition dispute had reached institution-level awareness and participation. Plaintiff does not allege that the involvement of Risk Management or counsel, standing alone, establishes retaliatory motive. **(Exhibit 13.)**

**37.** On December 4, 2025, Dr. Sarah Velten documented that Plaintiff remained frustrated with his treatment at UMass, continued requesting a PT evaluation, and stated that **"the transport chair he received does not work."** The same record documents continuing multidisciplinary discussions concerning placement and Plaintiff's motorized wheelchair. **(Supplemental Exhibit 1.)**

**38.** Plaintiff alleges that the foregoing sequence demonstrates that the dispute was not merely UMass's refusal to purchase or repair a preferred personal device. Plaintiff alleges that his powered wheelchair was unusable, the requested effective standard wheelchair was not made available to him, and the substitute transport chair was documented as not working. Plaintiff therefore alleges that he remained without an effective mobility accommodation despite repeated notice and requests. **(Exhibits 10-12; Supplemental Exhibits 1-2.)**

**39.** Plaintiff further alleges that the available UMass records do not document an individualized determination that modification of the "outpatient only" restriction, a Physical Therapy/DME evaluation, repair or battery-replacement coordination, or another effective

inpatient mobility accommodation would have been medically contraindicated, unreasonable, or a fundamental alteration of UMass's covered inpatient services. (**Exhibits 10-12**; **Supplemental Exhibits 1-2**; **Exhibit 17**.)

**40.** Because Plaintiff is paraplegic and cannot ambulate without wheelchair assistance, Plaintiff alleges that the absence of an effective mobility accommodation substantially confined him within the hospital and interfered with his ability to move about the facility, communicate directly with personnel involved in his disposition, participate effectively in discharge planning, exercise meaningful autonomy concerning placement, and implement a safe community-discharge plan.

**41.** On December 7, 2025, after the prolonged wheelchair, mobility, and discharge dispute described above, Plaintiff sustained a severe self-inflicted laceration to his left forearm and a Rapid Response was called. The Rapid Response record identifies "self inflicted trauma" and documents emergency evaluation and treatment. (**Supplemental Exhibit - RR**.)

**42.** The contemporaneous critical-care documentation states that clinicians managed **"life threatening blood loss and/or hemorrhagic shock so as to prevent death."** Plaintiff relies upon that record to establish the objective seriousness of the December 7 physical injury. (**Supplemental Exhibit - RR**.)

**43.** Plaintiff alleges from personal knowledge that the December 7 event occurred after escalating distress associated with his prolonged inability to obtain effective wheelchair mobility and his continuing efforts to leave the hospital or obtain a workable discharge plan. Plaintiff alleges this causal connection as a fact to be proven from the complete record; the Rapid Response document itself establishes the event and severity, not ultimate causation.

**44.** Immediately following the event, UMass placed Plaintiff on suicide precautions and constant observation and obtained psychiatric consultation. Plaintiff alleges that UMass therefore

treated the event as requiring immediate psychiatric-safety intervention in addition to emergency physical treatment. (**Supplemental Exhibit - RR**.)

**45.** On December 8, 2025, UMass psychiatrist Dr. Robin Stern documented the severe arm-cutting event. In the same psychiatric assessment, she documented Plaintiff's focus on obtaining his motorized wheelchair, his stated need to have it fixed before discharge because he would have no independence without it, and his objection to waiting until placement before addressing the wheelchair. Dr. Stern contemporaneously concluded that Plaintiff did not require inpatient psychiatric level of care and wrote: **"This was not a suicide attempt."** (**Exhibit 19**.)

**46.** Plaintiff alleges that the December 8 psychiatric assessment cannot be separated factually from the disability and mobility circumstances documented within that same assessment. The record addressed Plaintiff's psychiatric condition while simultaneously documenting his wheelchair dependence, loss of independence, disagreement concerning repair, and placement/discharge dispute. (**Exhibit 19**.)

**47.** Plaintiff does not presently allege that **Exhibit 19**, standing alone, proves that Dr. Stern intentionally falsified a medical record. Plaintiff alleges that her contemporaneous characterization of the event is material because it can be compared with her later alleged sworn characterization of the same event during the guardianship proceeding.

**48.** A later UMass hospital record contained in Plaintiff's Probate Opposition states that, as of January 2, 2026, psychiatry recommended discontinuing Section 12 and concluded that inpatient psychiatric admission was not required, while the plan nevertheless stated **"Continue 1:1 sitter"** and **"Continue security guard."** Plaintiff alleges that this documents continued intensive observation for a substantial period after the December 7 event. (**Registry Exhibit B**.)

**49.** By December 22, 2025, UMass was conducting an ongoing psychiatric-bed search. Social Work documented referrals including UMass psychiatric units and expressly listed the

barriers as "disposition, Wheelchair issue, and behaviors." Plaintiff alleges that UMass's own contemporaneous record therefore identifies the unresolved **"Wheelchair issue"** as one of the barriers operating within the psychiatric-placement process. Plaintiff does not allege that the wheelchair was the sole barrier to placement. **(Exhibit 17.)**

**50.** Plaintiff alleges that the March and December records together establish a recurring disability-access problem in psychiatric placement: UMass had previously documented that paraplegia, medical complexity, and a motorized wheelchair complicated psychiatric placement, and later expressly identified the **"Wheelchair issue"** as a barrier while an active psychiatric-bed search was underway. Plaintiff does not ask this Court to determine that he medically qualified for admission to a particular psychiatric unit at every moment. He alleges that his disability-related circumstances materially affected access to the psychiatric-placement process and that UMass failed to remove or reasonably modify the wheelchair-related access barrier. **(Exhibits 4-6 and 17.)**

**51.** On December 22, 2025, UMass's decision-making-capacity record expressly incorporated Plaintiff's expectations regarding "insurance coverage for DME supplies, wheelchair repair etc." into the capacity analysis. Immediately following that discussion, the record states that "[i]t will be helpful to have a substituted decision maker to assist with his care," and the same record states that **"Guardianship paperwork [was] completed."** Plaintiff alleges that this contemporaneous sequence constitutes direct documentary evidence that the wheelchair/DME dispute formed part of the decision-making process surrounding substituted decision making and guardianship. **(Exhibit 15.)**

**52.** Plaintiff does not allege that **Exhibit 15** discusses only DME or wheelchair issues. The record also discusses Plaintiff's interest in leaving against medical advice, UMass's assessment of the support it believed he required, and other psychiatric or behavioral matters.

Plaintiff alleges, however, that the express inclusion of "DME supplies, wheelchair repair etc." immediately before the substituted-decision-maker discussion is material to causation and intent. (**Exhibit 15**.)

**53.** Although the December 22 record states that guardianship paperwork had been completed, UMass did not then formally commence the Probate guardianship proceeding. Plaintiff relies upon the interval between documented guardianship planning and later formal filing as part of the chronology relevant to retaliation. (**Exhibit 15**; **Registry Exhibit P**.)

**54.** On January 5, 2026, Plaintiff filed this federal civil-rights action challenging, among other things, UMass's treatment of his disability-related accommodation, wheelchair, and discharge requests. (**Registry Exhibit A**; **Registry Exhibit P**.)

**55.** On January 7, 2026, two days after the federal filing, UMass-affiliated hospital counsel commenced a guardianship proceeding in Worcester Probate and Family Court seeking appointment of a guardian over Plaintiff. (**Registry Exhibit P**.)

**56.** Plaintiff does not allege that the January 5 federal action caused UMass to conceive of guardianship for the first time because UMass's own December 22 record establishes that guardianship planning already existed. Rather, Plaintiff alleges two related stages of protected activity and causation. (**Exhibit 15**; **Registry Exhibit P**.)

**57.** First, Plaintiff alleges that his repeated pre-January 5 disability-rights advocacy - including his requests for PT/DME evaluation, wheelchair assistance, effective alternative mobility, safe community discharge, and alternatives to institutional placement - was a but-for cause of UMass's decision to pursue substituted decision making and guardianship in the manner alleged. (**Exhibits 10-13, 15**; **Supplemental Exhibits 1-2**.)

**58.** Second, Plaintiff alleges that his January 5 federal civil-rights lawsuit constituted additional protected activity and that UMass's formal commencement of the Probate proceeding

two days later provides additional circumstantial evidence of retaliatory causation when considered with the preexisting documentary linkage between the wheelchair/DME dispute and guardianship decision making. (**Exhibit 15**; **Registry Exhibit P**.)

**59.** Plaintiff alleges from firsthand recollection that, at the March 17, 2026 Probate hearing, Dr. Robin Stern characterized the December 7 event as a serious suicide attempt. Dr. Stern's contemporaneous December 8 clinical record had stated that the event was "not a suicide attempt." Plaintiff has requested preservation of the original March 17 recording so the precise testimony may be established from the official audio rather than from recollection alone. (**Exhibit 19**; **Supplemental Exhibit - March 17 Audio Preservation Request**.)

**60.** Plaintiff alleges that the two characterizations are materially inconsistent regarding the psychiatric characterization of the December 7 event. Plaintiff does not allege that the presently available documentary evidence, without the preserved testimony and further discovery, conclusively establishes falsification, fraud, or perjury. Plaintiff alleges that the inconsistency is relevant to the manner in which UMass continued to justify and pursue the guardianship proceeding.

**61.** Plaintiff alleges that the objective seriousness of the December 7 injury and the question whether the act constituted a suicide attempt are distinct issues. Plaintiff relies upon the medical records as evidence of serious physical injury, while relying upon Dr. Stern's December 8 contemporaneous assessment and the preserved March 17 testimony as evidence concerning the allegedly conflicting psychiatric characterization of the event. (**Supplemental Exhibit - RR**; **Exhibit 19**; **Supplemental Exhibit - March 17 Audio Preservation Request**.)

**62.** Plaintiff alleges but-for retaliatory causation based upon the combined factual sequence: repeated disability-accommodation demands; the unresolved wheelchair and community-discharge barrier; institution-level disposition planning; the severe December 7

event; disability-related barriers within the psychiatric-placement process; the December 22 capacity record expressly incorporating DME and wheelchair-repair expectations into the substituted-decision-maker discussion; the January 5 federal civil-rights filing; the January 7 commencement of guardianship; and UMass's continued pursuit of that proceeding thereafter. (**Exhibits 10-13, 15, 17, 19**; **Supplemental Exhibits 1-2 and RR**; **Registry Exhibit P**.)

**63.** Plaintiff alleges that UMass would not have pursued guardianship in the manner alleged but for his protected Section 504 advocacy and that the January 5 federal filing was additional protected activity immediately preceding formal commencement of the Probate proceeding.

**64.** Plaintiff alleges that the alleged Section 504 accommodation failures caused prolonged loss of meaningful wheelchair mobility, interference with covered inpatient, PT/DME, care-coordination, discharge-planning, and psychiatric-placement services, loss of autonomy, and prolonged confinement to the extent proven causally attributable to UMass's conduct.

**65.** Plaintiff alleges that the retaliatory guardianship conduct separately caused concrete legal, practical, and economic injury and threatened restrictions upon his medical autonomy, discharge and placement choices, legal decision making, and ability to continue advocating for federal disability rights.

**66.** Plaintiff alleges fear and emotional distress as factual consequences of the alleged retaliation but does not seek emotional-distress damages under Section 504. Plaintiff seeks only categories of compensatory or other relief legally recoverable under Section 504 and proven to have been caused by the conduct alleged.

**B. Defendant Commonwealth of Massachusetts - Worcester Probate and Family Court / Registry Administrative Access Barriers**

**67.** The Registry events alleged below occurred during the same guardianship proceeding described above. Plaintiff's attempted Probate filings were material to his defense because they contained contemporaneous UMass medical records concerning his decision-making, wheelchair and DME dispute, psychiatric condition, guardianship timing, and proposed less restrictive alternatives, including **Exhibit 15**'s discussion of DME supplies, wheelchair repair, insurance coverage, a substituted decision maker, and completion of guardianship paperwork. (**Registry Exhibit B**.)

**68.** Plaintiff does not allege, absent discovery, that Registry personnel shared UMass's alleged retaliatory motive, knew why UMass pursued guardianship, or deliberately acted to advance UMass's interests. Plaintiff alleges a separate federal disability-access violation arising from the Commonwealth's filing, exhibit-intake, docketing, record-maintenance, counsel-status, and reasonable-modification services.

**69.** Plaintiff alleges that the importance of the Registry access barriers cannot be evaluated as though the underlying documents were immaterial paperwork. The record Plaintiff was attempting to establish concerned a live guardianship proceeding affecting his liberty, medical autonomy, discharge, placement, and legal decision making, and included the same UMass evidence underlying his federal disability and retaliation allegations. (**Registry Exhibit B**.)

**70.** On or about January 15, 2026, while hospitalized and physically unable to personally file documents at the courthouse, Plaintiff caused his Opposition to the temporary-guardianship request and its supporting exhibits to be commercially printed and sent to the Worcester Probate

and Family Court. The Opposition contained an organized exhibit record, including **Exhibit 15** and other contemporaneous UMass medical records. (**Registry Exhibits A and B**.)

**71.** UPS records establish that the Probate package was delivered to the Worcester courthouse mailroom on January 16, 2026 at 10:45 a.m., identifying **"Received By: KEN"** and "Mail Room" as the delivery location. Plaintiff further alleges from personal knowledge that Ken was courthouse mailroom personnel and that incoming courthouse mail was received through that mailroom. (**Registry Exhibit A**.)

**72.** **Registry Exhibit A** also documents a separately transmitted federal filing sent through the same commercial service. The federal Emergency Motion was docketed in this Court later that same day at 1:47 p.m. Plaintiff offers this comparison to establish successful commercial transmission and courthouse receipt, not to establish why the Probate package was thereafter handled differently. (**Registry Exhibit A**.)

**73.** The presently available Probate docket contains no identifiable contemporaneous January 16 entry recording receipt, acceptance, filing, deficiency, rejection, return, or other processing of the physically delivered Opposition package. Plaintiff alleges that the documentary sequence therefore places the unresolved processing issue after confirmed courthouse receipt. (**Registry Exhibits A and P**.)

**74.** Plaintiff alleges from firsthand recollection that, at the January 20, 2026 Probate hearing, after he informed the Court that he had submitted an Opposition, court personnel located the physically delivered materials and brought them before the presiding judge in open court.

**75.** Plaintiff alleges from firsthand recollection that he explained at the hearing that, because he remained hospitalized and physically confined, he had caused the Opposition and supporting exhibits to be commercially printed and delivered to the Probate Court.

**76.** Plaintiff further alleges that while the Opposition was physically before the Court, he specifically read or discussed the portion of **Exhibit 15** stating that he did "not have the realistic expectation about the insurance coverage for DME supplies, wheelchair repair etc." and the immediately following statement that "[i]t will be helpful to have a substituted decision maker to assist with his care." **(Exhibit 15; Registry Exhibit B.)**

**77.** Plaintiff alleges that he explained that **Exhibit 15** was material to his contention that the DME/wheelchair dispute was intertwined with UMass's substituted-decision-maker and guardianship decision making. Plaintiff further alleges from firsthand recollection that he informed the Probate Court that he had recently filed a federal civil-rights action concerning the underlying disability-accommodation dispute.

**78.** Plaintiff alleges that these January 20 events establish that the Court had actual physical possession and awareness of his Opposition and the substance of **Exhibit 15.** He alleges, however, that physical possession and open-court discussion did not result in the Opposition and its supporting exhibits becoming a complete identifiable docketed filing and working exhibit record. **(Registry Exhibits B and P.)**

**79.** Plaintiff has requested preservation of the complete January 20 hearing audio. **Registry Exhibit C** establishes the preservation demand and identification of the recording. Plaintiff relies upon his verified firsthand recollection - not the preservation request itself - for the alleged content of the hearing. **(Registry Exhibit C.)**

**80.** After the January 16 Opposition package failed to produce a complete identifiable docketed record, Plaintiff made a second physical filing attempt involving emergency Probate materials. **(Registry Exhibits D and P.)**

**81.** On January 22, 2026, Plaintiff gave the UPS Store contemporaneous written assembly instructions directing preparation of one Probate "COURT COPY" to be mailed to the Clerk of the Worcester Probate and Family Court at 225 Main Street. **(Registry Exhibit D.)**

**82.** The written instructions identified five filings to be included in that single Probate Court package: a cover letter to the Clerk, Emergency Motion to Vacate Temporary Guardianship Order, Emergency Motion to Enforce Appointment of Counsel, Affidavit of Arthur Burnham, and Certificate of Service. Plaintiff separately directed preparation of a service copy for UMass counsel. **(Registry Exhibit D.)**

**83. Registry Exhibit D** contains the shipment receipt and subsequently recovered historical UPS tracking information showing delivery in Worcester on January 23, 2026 at 11:34 a.m., identifying the location as "Mail Room," and recording the final scan as **"Commercial Inside Release."** Plaintiff's contemporaneous written instructions identify the corresponding Probate Court copy as the single assembled package containing the five specified filings. **(Registry Exhibit D.)**

**84.** The official Probate docket contains no identifiable January 23 entry reflecting receipt, acceptance, deficiency, rejection, return, or other processing corresponding to that documented delivery. Related filings appear later, but the recovered tracking establishes that a separate physical Probate package had already reached the courthouse. **(Registry Exhibits D and P.)**

**85.** Plaintiff alleges from personal knowledge that, on or about January 26 or 27, he telephoned the Worcester Probate Registry seeking an explanation for the absence of the January 23 delivery from the docket. Plaintiff recalls that a Registry employee stated that the package had been returned because it was **"not in one envelope,"** or words to that effect, and asked whether Plaintiff had received the returned package.

**86.** Plaintiff alleges that this reported explanation is difficult to reconcile with his contemporaneous UPS instructions identifying one Probate "COURT COPY" containing the five paper-clipped filings and the UPS documentation of a single tracked Probate shipment. Plaintiff does not presently allege who made any processing decision or why. He alleges that the discrepancy supports discovery concerning the package's receipt, routing, deficiency determination, rejection, return, and docket-processing history. **(Registry Exhibit D.)**

**87.** The January 23 physical filing attempt was material because Plaintiff was attempting to challenge the temporary guardianship order, obtain action concerning the appointment-of-counsel process, and create and preserve a record of material defense evidence while the guardianship proceeding remained active. **(Registry Exhibits D, J, and P.)**

**88.** On January 23, while attempting to establish the Probate record, Plaintiff separately transmitted by email to UMass's counsel his Opposition, judge-facing exhibit table, and identified supporting exhibits. **(Registry Exhibit E.)**

**89.** **Registry Exhibit E** documents nine attachments consisting of Plaintiff's Opposition, the judge-facing table, and seven identified exhibits. Attorney Jessica Flaherty acknowledged receipt in writing: **"Received. Thank you Mr. Burnham."** **(Registry Exhibit E.)**

**90.** Plaintiff does not allege that opposing counsel's receipt cured the Probate filing problem. He alleges that **Registry Exhibit E** independently corroborates that the substantive defense materials existed and were being transmitted during the same period in which he was attempting unsuccessfully to establish a complete Probate filing record.

**91.** Because the physical filing route had not produced a complete identifiable opposition-and-exhibit record, Plaintiff attempted electronic filing and then sought individualized modification of the Probate Court's ordinary filing procedures. **(Registry Exhibits F-H.)**

**92.** On January 27, 2026, eFileMA submissions concerning Plaintiff's emergency motion and supplemental memorandum were rejected under an administrative one-envelope requirement. (**Registry Exhibit F**.)

**93.** On January 28, 2026, Plaintiff attempted electronically to submit exhibits needed to complete his defense record. The submission was rejected on the ground that exhibits could not be e-filed. The exhibit-intake restriction was material because Plaintiff was attempting to place supporting medical evidence, including **Exhibit 15**, into the Probate record. (**Registry Exhibit G**.)

**94.** On January 28, Plaintiff filed a written Motion for Reasonable Accommodation under Title II of the ADA and Section 504. The motion expressly informed the Court that Plaintiff was paraplegic and confined to a hospital bed, lacked physical access to printers, copying services, and postal mail, had already incurred commercial expense attempting conventional filing, and had experienced rejection of electronically submitted exhibits. (**Registry Exhibit H**.)

**95.** Plaintiff did not demand only unrestricted eFileMA access. His motion proposed multiple alternatives: permission to submit exhibits through eFileMA, submission by email to the Clerk, attachment to a sworn affidavit, lodging the exhibits for review, or submission through another procedure ordered by the Court. (**Registry Exhibit H**.)

**96.** Plaintiff alleges that the January 28 motion gave Defendant particularized written notice both of his disability and of the specific functional barrier: because he was paraplegic and physically confined in the hospital, conventional in-person, printing, copying, and mailing procedures were not reliably available to him. The requested electronic or alternative method was the proposed modification needed to obtain access to the Court's existing filing and exhibit-intake services; Plaintiff does not allege that eFileMA itself was the public service. (**Registry Exhibit H**.)

**97.** On February 4, 2026, the Probate Court denied Plaintiff's January 28 accommodation request. The written disposition referred to the appointment of counsel. (**Registry Exhibit H**.)

**98.** Plaintiff alleges that, in his circumstances, appointed counsel could operate as an alternative filing mechanism only if counsel actually accepted the appointment and was available to transmit Plaintiff's filings, exhibits, and emergency materials.

**99.** That proposed alternative failed the following day. On February 5, appointed Attorney Jamison House expressly declined the appointment, requested that another attorney be appointed, and instructed the Probate Court: **"Please file in your usual manner."** (**Registry Exhibit I**.)

**100.** Plaintiff therefore alleges a closed-loop access problem: his two physical filing efforts had not produced a complete identifiable record; electronic exhibit submission had been rejected; his individualized accommodation request had been denied in connection with appointment of counsel; and the lawyer appointed as the proposed alternative declined before Plaintiff had an effective substitute filing route. (**Registry Exhibits A, D, G-I**.)

**101.** On February 6, the Massachusetts Appeals Court requested a CPCS status report concerning appointment of counsel in the Probate matter. Plaintiff relies upon **Registry Exhibit J** to establish that counsel status was itself under appellate attention during the period in which his filing-access problem remained unresolved. (**Registry Exhibit J**.)

**102.** On February 9, 2026 at approximately 8:22 a.m., Plaintiff's pro se eFileMA submission of emergency materials was rejected. The stated clerk comment was **"counsel must file."** (**Registry Exhibit K**.)

**103.** Plaintiff does not allege that the later February 9 11:29 a.m. Registry RECEIVED stamp on Attorney House's declination preceded the 8:22 a.m. rejection. Plaintiff alleges that the relevant disability-access injury was the closed loop itself: his self-filing accommodation had

been denied, the appointed lawyer had already declined, no successor counsel was functioning, and Plaintiff's own submission was nevertheless rejected because **"counsel must file."** **(Registry Exhibits H-K.)**

**104.** **Registry Exhibit L** establishes that House's declination later received a Registry RECEIVED stamp dated February 9 at 11:29 a.m. and a separate FILED FEB 13 2026 stamp. These markings establish distinct receipt and filing events. **(Registry Exhibit L.)**

**105.** Plaintiff alleges that the distinction between receipt, filing, processing, docketing, and operational counsel status is material because his own filings were being screened on the premise that counsel was required to act for him. **(Registry Exhibits K and L.)**

**106.** The currently available Probate docket identifies House's appointment as terminated effective February 18. Plaintiff presently does not know when that information was entered, modified, displayed, or made operational in the Registry's filing-review systems. He seeks discovery concerning those matters, including any available docket audit history, counsel-status history, timestamps, metadata, routing information, and modification history. **(Registry Exhibits O and P.)**

**107.** Rather than disregarding the representation requirement, Plaintiff affirmatively attempted to determine who represented him and who was permitted to file on his behalf.

**108.** On February 16, 2026, Plaintiff prepared a Motion for Clarification of Counsel Status asking the Probate Court to identify current counsel, determine whether counsel had accepted and appeared, and clarify who could file. **(Registry Exhibit M.)**

**109.** Plaintiff submitted that motion through eFileMA on February 17 at approximately 1:41 p.m. The following morning, February 18 at approximately 8:01 a.m., the Registry rejected it. **(Registry Exhibits M and N.)**

**110.** The clerk's additional comment stated: **"efile down please file by mail or in person."** (**Registry Exhibit N**.)

**111.** Plaintiff alleges that this instruction compounded the disability-access barrier because Defendant had already received written notice that Plaintiff was paraplegic, hospitalized, physically confined, lacked practical access to ordinary printing and mailing, and could not reliably use conventional in-person or paper filing procedures. (**Registry Exhibits H, M, and N**.)

**112.** Plaintiff further alleges that the February 18 rejection did not resolve the question the filing itself was attempting to present - who was his functioning attorney and who could file for him. (**Registry Exhibits M and N**.)

**113.** On February 19, 2026, Attorney House personally contacted Worcester Probate concerning the unresolved replacement-counsel issue. House explained that he had been appointed February 4, had declined, had mailed his declination on February 5, and had requested appointment of replacement counsel. (**Registry Exhibit O**.)

**114.** Worcester Probate Guardianship responded that same morning: **"It does not appear the Registry has processed your declination. I am happy to forward this email to them in order to expedite the same."** (**Registry Exhibit O**.)

**115.** In August 2026, Attorney House personally supplied Plaintiff the contemporaneous correspondence. House additionally stated that his notes reflected that he mailed the declination to the court on February 5. Plaintiff did not possess this first-hand attorney evidence when the Third Amended Complaint was prepared. (**Registry Exhibit O**.)

**116.** Plaintiff alleges that the documentary sequence concerning House's status is therefore: House declined and requested replacement counsel February 5; the Registry marked the declination RECEIVED February 9 at 11:29 a.m.; marked it FILED February 13; the present

docket identifies House's appointment as terminated effective February 18; and on February 19 Worcester Probate personnel nevertheless stated that the Registry did not appear to have processed the declination. (**Registry Exhibits I, L, O, and P**.)

**117.** Plaintiff does not presently allege who was responsible for any discrepancy or whether any record was intentionally changed. He alleges that this sequence warrants discovery concerning when House's declination became operationally effective for filing-review and representation-status purposes.

**118.** Attorney Naomi Lovelle Shelton was subsequently appointed as Plaintiff's court-appointed counsel.

**119.** Plaintiff alleges from firsthand recollection that, during the March 31, 2026 Probate hearing, Attorney Shelton discussed on the record inconsistencies she had personally observed concerning her appointment, counsel status, or represented status on the Probate docket.

**120.** Plaintiff recalls that Attorney Shelton stated, in substance, that information she observed on one review of the docket did not correspond with the appointment information she understood to be accurate and that, on a later review, the relevant information appeared differently.

**121.** Plaintiff recalls that the Probate judge questioned Attorney Shelton concerning what she had observed and that Attorney Shelton further explained the differing information she had personally seen.

**122.** Plaintiff alleges that these statements are material because they concerned Attorney Shelton's own appointment and her own firsthand observations of the court's counsel-status information rather than merely Plaintiff's interpretation of the docket.

**123.** Plaintiff does not allege that Attorney Shelton's reported statements establish who made any change, whether any change was improper, or why any information appeared

differently. Plaintiff alleges that her firsthand observations, if confirmed, corroborate the documentary counsel-status discrepancies and justify discovery concerning relevant audit and modification history.

**124.** Plaintiff has requested preservation of the complete March 31 Probate hearing audio. **Registry Exhibit C** proves the preservation demand and identification of the recording; Plaintiff relies upon his verified firsthand recollection for the alleged hearing content. **(Registry Exhibit C.)**

**125.** Defendant had express and particularized disability-related notice no later than Plaintiff's January 28 written accommodation request, which stated that he was paraplegic, confined to a hospital bed, lacked printing, copying, and postal access, and required an alternative method to submit exhibits and supporting evidence. **(Registry Exhibit H.)**

**126.** Defendant received renewed notice on February 17 when Plaintiff again stated that he remained paraplegic and physically confined, lacked printing and mailing access, could not conventionally submit paper filings, and required electronic filing, email filing, or another identified accessible mechanism. **(Registry Exhibit H.)**

**127.** Plaintiff alleges that Defendant therefore had repeated opportunities to provide an effective accessible mechanism after learning that ordinary filing procedures did not work for him and after the counsel alternative associated with the February 4 accommodation denial had itself failed.

**128.** Plaintiff alleges that the continuing barriers included: two separately documented physical courthouse deliveries without corresponding identifiable contemporaneous processing records; one-envelope eFileMA rejections; electronic exhibit restrictions; denial of the individualized accommodation request; immediate failure of the appointed-counsel alternative; the "counsel must file" rejection during the counsel gap; Registry RECEIVED and FILED

stamps on the declination; Plaintiff's unsuccessful attempt to obtain counsel-status clarification; the direction to **"file by mail or in person"** after disability-related notice; and the subsequent statement that House's declination still did not appear processed. **(Registry Exhibits A, D, F-I, K-P.)**

**129.** Plaintiff does not allege that either January physical-filing problem, viewed alone, automatically establishes disability discrimination. Rather, Plaintiff alleges that the physical filing failures demonstrated that the ordinary filing route was not giving him reliable access; his disability and physical confinement prevented him from personally correcting that problem through normal in-person procedures; and Defendant thereafter received express requests for an individualized alternative.

**130.** Plaintiff alleges that after Defendant received this particularized notice, the continued failure to provide an effective alternative was no longer merely an unexplained clerical inconvenience. Plaintiff alleges that the filing, exhibit-intake, accommodation, and counsel-status processes continued to leave him without a reliable way to complete and preserve an identifiable working defense record while the guardianship remained active. **(Registry Exhibits H-P.)**

**131.** Plaintiff does not allege that he was entirely prohibited from speaking during Probate hearings. His claimed injury is different: he alleges that he lacked a reliable disability-accessible method to create, complete, and preserve an identifiable working court record of his substantive opposition exhibits and emergency filings while the guardianship remained active.

**132.** The missing or incomplete working record was material because the Opposition and supporting evidence concerned Plaintiff's medical decision-making, psychiatric condition, DME and wheelchair dispute, disability-accommodation requests, guardianship timing, less restrictive

alternatives, and **Exhibit 15**'s documented link between DME/wheelchair expectations and substituted decision making. (**Registry Exhibit B**.)

**133.** Plaintiff alleges that these filing and record barriers impaired his ability to present and preserve a documentary defense to a proceeding affecting liberty, autonomy, medical decision making, discharge, placement, and his ability to direct his affairs.

**134.** Plaintiff does not ask this Court to review, reverse, vacate, modify, or sit in appellate review of any Probate Court guardianship ruling.

**135.** Plaintiff challenges independent administrative conduct concerning filing intake, docket processing, exhibit intake, eFileMA review, counsel-status processing, record maintenance, and processing of disability-related reasonable-modification requests. He does not ask this Court to decide whether any Probate judge reached the correct substantive guardianship decision.

**136.** Plaintiff alleges that the later termination or dismissal of the guardianship proceeding did not retroactively restore the disability-accessible filing and record services he alleges were denied while the proceeding was active.

**137.** Plaintiff alleges that Defendant's conduct after particularized disability-related notice was knowing and intentional rather than solely the product of one isolated clerical mistake. Plaintiff relies upon the repeated written notice, repeated requested alternatives, documented failure of the appointed-counsel alternative, continuing filing restrictions, and continuing counsel-status problem. Plaintiff does not rely upon negligence alone. (**Registry Exhibits H-O**.)

**138.** Plaintiff alleges deliberate indifference because, after actual notice that his disability and physical confinement made ordinary filing procedures inaccessible or unreliable, Defendant allegedly knew that denial of an effective modification was substantially likely to impair his

federally protected access to court filing and record services and failed to provide an effective alternative despite opportunities to do so.

**139.** Plaintiff seeks monetary relief only to the extent legally available and only upon satisfaction of the applicable intentional-discrimination standard under Title II and Section 504.

**140.** Plaintiff alleges that the completed access injury was his inability, during a critical period of the active guardianship proceeding, to establish and preserve through a reliable disability-accessible filing mechanism a complete identifiable working record of material opposition evidence and emergency filings. (**Registry Exhibits B and P**.)

**141.** In addition to the Title II claim, Plaintiff pleads Section 504 against the Commonwealth to the extent the relevant Massachusetts Trial Court program or activity receives federal financial assistance.

**142.** **Registry Exhibit Q** is an official Commonwealth FY2026 Trial Court budget record documenting federal spending within the Massachusetts Trial Court, including federally funded guardianship-related spending. Plaintiff relies upon that public record as documentary support for the federal-financial-assistance predicate of his parallel Section 504 claim. (**Registry Exhibit Q**.)

## VI. CLAIMS FOR RELIEF

### COUNT I - VIOLATION OF SECTION 504 OF THE REHABILITATION ACT - FAILURE TO MAKE REASONABLE MODIFICATIONS AND DENIAL OF MEANINGFUL ACCESS TO INPATIENT MOBILITY, CARE-COORDINATION, DISCHARGE-PLANNING, AND PSYCHIATRIC-PLACEMENT SERVICES; INTENTIONAL DISCRIMINATION AND DELIBERATE INDIFFERENCE ALLEGED FOR MONETARY RELIEF - AGAINST DEFENDANT UMASS MEMORIAL MEDICAL CENTER, INC.

**143. Incorporation.** Plaintiff incorporates the preceding allegations concerning Defendant UMass, including the UMass **Exhibit Anchors** and the allegations concerning wheelchair-related injury, effective mobility, Physical Therapy/DME requests, discharge planning, psychiatric placement, the December 7 event, disability-related barriers documented in UMass's records, and guardianship-related chronology.

**144. Federal Funding and Disability Status.** Defendant UMass receives federal financial assistance and is subject to Section 504 of the Rehabilitation Act. Plaintiff is an individual with a disability within the meaning of Section 504. Plaintiff is paraplegic and depends upon wheelchair mobility for movement, independence, access to services, and community discharge.

**145. Qualified Access to Covered Services.** Plaintiff alleges that he was otherwise qualified to receive the covered inpatient services at issue, subject to ordinary medical eligibility requirements. Those services included inpatient mobility assistance, Physical Therapy/DME evaluation and coordination, care coordination, discharge planning, and, when UMass itself was conducting an inpatient psychiatric-bed search, meaningful and nondiscriminatory access to that psychiatric-placement process.

**146. Nature of the Requested Modification.** Plaintiff does not allege that Section 504 categorically required UMass to purchase, repair, or replace every personally owned wheelchair

or that Section 504 required psychiatric admission when Plaintiff did not satisfy applicable clinical criteria. Plaintiff alleges that his paralysis and dependence upon functioning wheelchair mobility required UMass to make reasonable, individualized modifications to disability-related administrative and access barriers so that he could meaningfully participate in the covered services UMass was providing.

**147. Mobility and Discharge-Planning Barrier.** During Plaintiff's Fall 2025 admission, his powered wheelchair became nonfunctional. UMass knew that Plaintiff was paraplegic and dependent upon functioning mobility equipment, knew that his prior wheelchair circumstances had caused serious physical injury, and received repeated requests for wheelchair-related assistance and PT/DME evaluation. UMass nevertheless documented that wheelchair repair or replacement "cannot be done while inpt at UMass" and that insurance would pay only when Plaintiff was seen as an outpatient. Plaintiff alleges that UMass continued applying those administrative and coverage-related restrictions without providing an effective individualized alternative that afforded him meaningful mobility and discharge access. (**Exhibits 1-3, 7, 10-12**; **Supplemental Exhibits 1-2**.)

**148. Ineffective Alternative Mobility.** Plaintiff further alleges from personal knowledge that he requested a basic manual or hospital wheelchair when UMass would not repair his powered chair so that he could get out of bed, move through the facility, communicate with staff, and exercise his ability to leave if otherwise medically permitted. In addition, UMass's December 4 physician record documents that Plaintiff reported that "the transport chair he received does not work," while he continued requesting PT and discussions concerning placement and the motorized wheelchair remained ongoing. Plaintiff alleges that UMass therefore had notice not merely that his preferred powered chair was unavailable, but that he remained without an effective alternative means of wheelchair mobility. (**Supplemental Exhibit 1**.)

**149. Resulting Meaningful-Access Injury.** Plaintiff alleges that because he cannot ambulate without wheelchair assistance, the absence of an effective mobility accommodation substantially confined him within the hospital and interfered with his ability to move about the facility, communicate directly with personnel involved in his disposition, participate effectively in discharge planning, and implement a safe community-discharge plan. Plaintiff alleges that the challenged denial was therefore not merely a dispute over ownership or repair of personal equipment, but a denial of effective disability access to services UMass was already providing.

**150. Earlier Psychiatric-Placement Barrier.** UMass's March 2025 records separately document that Plaintiff's inpatient psychiatric-bed search was "Complicated by medical; paraplegia" and later "Complicated d/t medical complexities; paraplegia with motorized wheelchair, chronic cath." The records also document that 8E declined Plaintiff due to acuity. Plaintiff does not allege that these records establish that 8E expressly declined him solely because of paraplegia. Plaintiff alleges that they establish that his disability-related medical and wheelchair circumstances were expressly affecting the psychiatric-placement process. **(Exhibits 4-6.)**

**151. December 2025 Psychiatric-Placement Barrier.** Following the December 7 event and subsequent psychiatric involvement, UMass later conducted an ongoing psychiatric-bed search. On December 22, 2025, Social Work documented referrals that included UMass psychiatric units and expressly listed the barriers as "disposition, Wheelchair issue, and behaviors." Plaintiff alleges that this contemporaneous record directly establishes that the unresolved wheelchair issue was operating as one identified barrier in the psychiatric-placement process. Plaintiff does not allege that the wheelchair was the sole barrier to placement. **(Exhibit 17.)**

**152. Nature of the Psychiatric-Access Claim.** Plaintiff does not ask this Court to second-guess a medical judgment that he did or did not satisfy psychiatric-admission criteria at any particular moment. Dr. Stern's December 8 assessment, for example, stated at that time that Plaintiff did not require inpatient psychiatric level of care. Plaintiff's Section 504 allegation instead concerns the separate disability-access question reflected in UMass's own placement records: when UMass was actually conducting psychiatric-placement searches, Plaintiff's paraplegia, medical complexity, motorized wheelchair, and later the identified **"Wheelchair issue"** materially affected access to the placement process. Plaintiff alleges that UMass failed to provide or identify a reasonable modification capable of removing or mitigating the disability-related wheelchair barrier when psychiatric placement was otherwise being pursued.

**153. Actual Knowledge.** UMass had actual notice of the relevant disability-access problems. Its records documented Plaintiff's paralysis; dependence upon wheelchair mobility; serious prior wheelchair-related injury; repeated PT/DME and repair requests; the nonfunctional powered chair; the ineffective transport chair; the "outpatient only" restriction; the relationship between functioning wheelchair mobility and safe community discharge; earlier psychiatric-placement complications involving paraplegia and the motorized wheelchair; and, on December 22, the **"Wheelchair issue"** as an express psychiatric-placement barrier. Plaintiff alleges that this cumulative record gave UMass actual notice that its ordinary procedures and unresolved equipment barriers were substantially likely to deny him meaningful access because of disability. **(Exhibits 1-7, 10-13, 17, 19; Supplemental Exhibits 1-2.)**

**154. Failure to Take Corrective Action.** Despite repeated notice, Plaintiff alleges that UMass did not provide an effective mobility modification, did not timely implement the requested PT/DME mechanism, continued relying upon inpatient/outpatient and insurance restrictions, and permitted the unresolved wheelchair problem to continue affecting both

community-discharge planning and, when psychiatric placement was being sought, the psychiatric-placement process.

**155. Intentional Discrimination / Deliberate Indifference.** Plaintiff seeks compensatory damages under Section 504 only upon the legally required showing of intentional discrimination. Plaintiff alleges deliberate indifference as evidence of intentional discrimination because UMass had actual knowledge that harm to his federally protected disability-access rights was substantially likely and, despite repeated requests and institution-level notice, failed to take available corrective action. Plaintiff does not rely upon negligence, medical malpractice, or a mere disagreement with treatment.

**156. Causation.** Plaintiff alleges that the need for the requested modifications arose directly from his paraplegia and wheelchair dependence. With respect to psychiatric placement, Plaintiff does not allege that he was entitled to admission to a particular unit regardless of independent clinical or placement criteria. Plaintiff alleges that the wheelchair-related access barrier itself arose from his disability-related mobility needs, that UMass expressly identified that **"Wheelchair issue"** as a barrier, and that UMass failed to reasonably modify that disability-related barrier while the covered placement process was being provided. Plaintiff alleges that other independent placement considerations did not eliminate the need to address the separate disability-related access barrier.

**157. Injury.** As a direct and proximate result of the alleged Section 504 violations, Plaintiff alleges prolonged loss of meaningful mobility; interference with access to inpatient mobility, PT/DME, care-coordination, and discharge-planning services; prolonged confinement and loss of autonomy to the extent proven causally attributable to the denial of effective accommodation; and loss or impairment of meaningful access to psychiatric-placement opportunities during periods in which UMass was actually conducting psychiatric-bed searches.

Plaintiff seeks only legally recoverable damages proven to have resulted from the discrimination alleged.

**COUNT II - RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT - AGAINST DEFENDANT UMASS MEMORIAL MEDICAL CENTER, INC.**

**158. Incorporation.** Plaintiff incorporates the preceding allegations concerning UMass, including the UMass **Exhibit Anchors** and the allegations concerning mobility accommodation, psychiatric-placement access, disability advocacy, guardianship planning, and the subsequent Probate proceeding.

**159. Protected Activity.** Plaintiff engaged in activity protected by Section 504 by repeatedly requesting reasonable disability-related modifications and opposing practices he believed denied him meaningful access because of disability. That activity included seeking a PT/DME evaluation, repair or battery assistance for his powered wheelchair, an effective alternative wheelchair or mobility accommodation, meaningful access to inpatient and discharge-planning services, safe community discharge, and alternatives to unnecessary institutional placement. Plaintiff additionally engaged in protected activity when he filed his federal civil-rights action on January 5, 2026. (**Exhibits 10-13, 17**; **Supplemental Exhibits 1-2**.)

**160. Materially Adverse Action.** UMass planned, formally commenced, and thereafter pursued guardianship proceedings seeking authority capable of materially restricting Plaintiff's medical and legal autonomy, discharge and placement decisions, and ability to direct his affairs. Plaintiff alleges that initiation and pursuit of such proceedings could dissuade a reasonable person from continuing to assert disability-accommodation rights. (**Exhibit 15**; **Registry Exhibit P**.)

**161. Documentary Causal Link.** UMass's December 22 capacity record expressly incorporated Plaintiff's expectations concerning "insurance coverage for DME supplies, wheelchair repair etc." immediately before stating that a substituted decision maker would be helpful and recording that guardianship paperwork had been completed. Plaintiff alleges that this is direct documentary evidence connecting the subject matter of his disability advocacy to UMass's substituted-decision-maker and guardianship decision-making process. The ultimate retaliatory motive remains an inference to be determined from the complete record. **(Exhibit 15.)**

**162. Temporal Evidence.** Plaintiff further alleges that UMass did not formally commence the Probate proceeding when guardianship paperwork was documented as completed on December 22. Plaintiff filed this federal civil-rights action on January 5, 2026, and UMass-affiliated hospital counsel formally commenced the guardianship proceeding on January 7, 2026. Plaintiff alleges that this two-day temporal proximity constitutes additional circumstantial evidence of retaliatory causation when considered with the earlier documentary linkage and the full accommodation chronology. **(Exhibit 15; Registry Exhibit P.)**

**163. Two-Stage Causation.** Plaintiff does not contend that his January 5 federal lawsuit caused the initial idea of guardianship because UMass's own record establishes guardianship planning by December 22. Rather, Plaintiff alleges that his earlier, repeated Section 504 advocacy was a but-for cause of the guardianship planning and that his January 5 federal action was additional protected activity immediately preceding UMass's formal commencement and continued pursuit of the proceeding. Plaintiff alleges that, absent his disability-rights advocacy, UMass would not have pursued guardianship in the manner and sequence alleged.

**164. Continued Pursuit and Psychiatric Characterization.** Plaintiff alleges that UMass continued pursuing guardianship after commencement of this federal action and relied upon psychiatric evidence concerning the December 7 event. Plaintiff alleges from firsthand

recollection that Dr. Stern characterized that event at the March 17 Probate hearing as a serious suicide attempt, while her December 8 contemporaneous record stated that it was "not a suicide attempt." Plaintiff relies upon the inconsistency as evidence relevant to the continued development and pursuit of the guardianship justification, subject to confirmation from the preserved official recording. Plaintiff does not allege that the presently available documents alone establish falsification, fraud, or perjury. **(Exhibit 19; Supplemental Exhibit - March 17 Audio Preservation Request.)**

**165. Injury.** Plaintiff alleges that UMass's retaliatory conduct caused concrete legal, practical, and economic injury and subjected him to a proceeding threatening his autonomy, discharge, placement, and control of his affairs. Plaintiff seeks only those forms of compensatory or other relief legally recoverable under Section 504 and proven to have been caused by the retaliation.

## COUNT III - VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT - FAILURE TO PROVIDE REASONABLE MODIFICATION AND MEANINGFUL ACCESS TO JUDICIAL FILING, EXHIBIT-INTAKE, DOCKETING, RECORD-MAINTENANCE, AND COUNSEL-STATUS SERVICES - AGAINST DEFENDANT COMMONWEALTH OF MASSACHUSETTS

**166. Incorporation.** Plaintiff incorporates the preceding allegations concerning Defendant Commonwealth of Massachusetts, including the **Registry Exhibit Anchors** and the allegations concerning physical filing, exhibit intake, eFileMA review, reasonable-modification requests, docket processing, counsel-status processing, and record maintenance.

**167. Public Entity / Federally Assisted Program.** Defendant Commonwealth of Massachusetts, acting through the Massachusetts Trial Court, Worcester Probate and Family Court, and Registry, is a public entity subject to Title II of the ADA. Plaintiff further alleges that the relevant Massachusetts Trial Court program or activity receives federal financial assistance

and is subject to Section 504, as supported by the official FY2026 Trial Court funding record. (**Registry Exhibit Q**.)

**168. Qualified Individual With a Disability.** Plaintiff is a qualified individual with a disability. During the relevant period, Plaintiff was paraplegic, hospitalized, and physically confined. Plaintiff was otherwise eligible to use the Probate Court's filing, exhibit-intake, docketing, record-maintenance, counsel-status, and reasonable-accommodation services in defending himself in the guardianship proceeding.

**169. Services at Issue.** The public services challenged in this Count are the Court's existing filing intake, exhibit intake, docket processing, record-maintenance, counsel-status processing, eFileMA review, and reasonable-modification processes. Plaintiff does not allege that unrestricted electronic filing itself was the public service. Electronic filing, email filing, affidavit attachment, lodging of exhibits, or another effective alternative were modifications Plaintiff proposed as means of obtaining meaningful access to the underlying judicial services.

**170. Materiality of Access.** Plaintiff sought those services in order to create and preserve a working defense record in a guardianship proceeding affecting his liberty, medical autonomy, discharge, placement, and legal decision-making. The evidence he sought to place into that record included his substantive Opposition and contemporaneous medical materials concerning capacity, psychiatric status, DME and wheelchair issues, substituted decision making, guardianship timing, and less restrictive alternatives, including **Exhibit 15**. (**Registry Exhibit B**.)

**171. Physical Filing History.** Before requesting a disability-related modification, Plaintiff made substantial efforts to use ordinary physical filing procedures. UPS records establish delivery of his Opposition package to the Worcester courthouse mailroom on January 16, 2026 at 10:45 a.m. A separately recovered UPS record establishes delivery of another

Probate filing package on January 23 at 11:34 a.m. Plaintiff alleges that the presently available official Probate docket contains no identifiable contemporaneous processing entry corresponding to either physical package. (**Registry Exhibits A, D, and P**.)

**172. Physical Filing Problems Standing Alone.** Plaintiff does not allege that the January physical-processing problems, standing alone, automatically constituted disability discrimination. Plaintiff alleges that those experiences demonstrated that the ordinary physical route was not providing him a reliable mechanism for establishing his defense record, while his paraplegia and hospital confinement prevented him from personally appearing at the Registry to investigate, retrieve, correct, reassemble, or refile the materials through ordinary in-person procedures.

**173. Electronic Exhibit Barrier.** After the physical filing problems, Plaintiff attempted electronic submission. On January 27, eFileMA submissions were rejected under a one-envelope requirement, and on January 28 his attempt to submit supporting exhibits was rejected because exhibits could not be e-filed. Plaintiff alleges that these restrictions were particularly consequential because the exhibits were material evidence he was attempting to place into the guardianship record. (**Registry Exhibits F and G**.)

**174. Particularized Request for Reasonable Modification.** On January 28, Plaintiff expressly requested reasonable modification under Title II and Section 504. He informed Defendant that he was paraplegic, confined to a hospital bed, lacked physical access to printers, copying services, and postal mailing, had already incurred commercial expense attempting conventional filing, and required an alternative means to submit evidence. He proposed several alternatives rather than demanding one particular method: eFileMA submission, email to the Clerk, attachment to a sworn affidavit, lodging of exhibits, or submission through another method directed by the Court. (**Registry Exhibit H**.)

**175. Necessity of the Modification.** Plaintiff alleges that an individualized modification was necessary because his disability and related physical confinement materially limited his ability to obtain effective access through the ordinary in-person, printing, copying, and mailing procedures available to persons able to physically reach and interact with the Registry.

**176. Reasonableness.** Plaintiff alleges that the requested alternatives were limited methods of accessing existing court services and would not have fundamentally altered the nature of filing, exhibit-intake, docketing, or record-maintenance services. Plaintiff further alleges that even if Defendant rejected his specific proposed methods, he requested an identification or provision of some other effective mechanism consistent with his disability-related limitations. **(Registry Exhibit H.)**

**177. February 4 Denial and Counsel Alternative.** On February 4, the Probate Court denied Plaintiff's accommodation request while referring him to the appointment of counsel. Plaintiff alleges that, as applied to his circumstances, appointed counsel could serve as an effective alternative filing mechanism only if counsel actually accepted the appointment and was available to transmit Plaintiff's filings and supporting evidence. **(Registry Exhibit H.)**

**178. Failure of the Identified Alternative.** The counsel alternative failed the following day. Attorney Jamison House expressly declined the appointment on February 5, requested appointment of successor counsel, and asked the Probate Court to file his declination. Plaintiff alleges that he was therefore left without the self-filing modification he had requested and without functioning appointed counsel capable of providing the substitute access upon which the denial had relied. **(Registry Exhibit I.)**

**179. "Counsel Must File" Closed Loop.** During the resulting nonfunctioning-counsel gap, Plaintiff's February 9 pro se eFileMA submission was rejected with the clerk comment **"counsel must file."** Plaintiff alleges that this created a closed-loop disability-access barrier: his

requested self-filing modification had been denied because counsel would be appointed; appointed counsel had declined; no successor counsel was then functioning; and Plaintiff's effort to act for himself was rejected because counsel supposedly had to file. **(Registry Exhibits H-K.)**

**180. Counsel-Status Processing.** **Registry Exhibit L** establishes that House's declination was stamped RECEIVED February 9 at 11:29 a.m. and separately stamped FILED February 13, 2026. Plaintiff does not allege that the 11:29 a.m. RECEIVED stamp preceded his earlier 8:22 a.m. February 9 eFileMA rejection. Plaintiff alleges instead that the subsequent receipt, filing, termination, and processing history is material because his own filing rights were being determined by operational counsel status. **(Registry Exhibits K and L.)**

**181. Plaintiff's Attempt to Correct the Problem.** Plaintiff thereafter attempted to clarify who represented him and who could file on his behalf. He submitted a Motion for Clarification of Counsel Status through eFileMA on February 17. On February 18, the Registry rejected the submission with the instruction **"efile down please file by mail or in person."** **(Registry Exhibits M and N.)**

**182. Renewed Disability Notice.** Before that rejection, Plaintiff had renewed his disability-accommodation request and again informed Defendant that he remained paraplegic and physically confined, lacked access to printers and mailing services, could not conventionally submit paper filings, and required electronic filing, email filing, or another identified accessible mechanism. Plaintiff alleges that the February 18 direction to **"file by mail or in person"** therefore directed him back to methods Defendant had specifically been told he could not reliably use. **(Registry Exhibits H, M, and N.)**

**183. Evidence That Counsel Processing Remained Unresolved.** On February 19, Attorney House contacted Worcester Probate regarding the unresolved replacement-counsel problem. Worcester Probate responded that "It does not appear the Registry has processed your

declination" and offered to forward the matter to the Registry to expedite it. Plaintiff later obtained this correspondence directly from House, who also stated that his notes reflected mailing the declination on February 5. (**Registry Exhibit O**.)

**184. Subsequent Firsthand Counsel-Status Evidence.** Plaintiff further alleges from firsthand recollection that successor counsel Attorney Naomi Shelton later stated during the March 31 Probate hearing that appointment or counsel-status information appeared differently between her reviews of the docket. Plaintiff does not allege that those statements establish who changed any information or why. Plaintiff alleges that, if confirmed by the preserved recording, they provide additional firsthand support for the existence of an operational counsel-status problem during the relevant period. (**Registry Exhibit C**.)

**185. Denial of Meaningful Access Under Title II.** Plaintiff alleges that, after Defendant received actual notice of his disability-related limitations and the need for modification, Defendant failed to provide an effective reasonable modification and thereby denied Plaintiff meaningful access to the Court's filing, exhibit-intake, docketing, record-maintenance, and counsel-status services by reason of his disability-related need for an accessible method of obtaining those services.

**186. Parallel Section 504 Claim.** To the extent the relevant Trial Court program or activity receives federal financial assistance, Plaintiff alleges the same conduct violated Section 504. Plaintiff alleges that the need for the denied modification arose solely from the functional consequences of his disability and disability-related physical confinement, and that absent those disability-related limitations he could have used ordinary in-person and conventional filing procedures to correct the filing problems himself. Plaintiff pleads Section 504 subject to its distinct causation requirements. (**Registry Exhibit Q**.)

**187. Actual Knowledge.** Defendant had actual and particularized notice of the disability-related access problem through Plaintiff's January 28 and February 17 written accommodation requests. Defendant also knew that the alternative identified in connection with the February 4 denial had failed because House declined, the declination reached the Registry and was later filed, and Plaintiff continued attempting to submit filings and clarify representation status. (**Registry Exhibits H, I, L-N**.)

**188. Repeated Opportunity to Correct.** Plaintiff alleges that Defendant had multiple opportunities after actual notice to provide an effective accessible mechanism: after the January 28 request; after the February 5 declination; after the February 9 "counsel must file" rejection; after House's declination was received and filed; after Plaintiff's renewed February 17 request; and after Plaintiff attempted to clarify counsel status. Plaintiff alleges that no reliable accessible route was supplied during the critical period alleged. (**Registry Exhibits H-N**.)

**189. Intentional Discrimination / Deliberate Indifference.** Plaintiff seeks compensatory damages only to the extent legally available and only upon proof of the required intentional-discrimination standard. Plaintiff alleges deliberate indifference because Defendant had actual knowledge that harm to his federally protected disability-access rights was substantially likely and nevertheless failed to take available corrective action after repeated notice and repeated opportunity to do so. Plaintiff does not base this claim upon negligence, inadvertence, or one isolated clerical mistake.

**190. No Conspiracy Allegation.** Plaintiff does not allege in this Count, absent discovery, that Registry personnel shared UMass's alleged retaliatory motive, agreed with UMass to interfere with Plaintiff's defense, or intentionally concealed evidence on UMass's behalf. The Commonwealth claim is based upon the separate alleged failure to provide meaningful disability-accessible judicial services after particularized notice.

**191. Completed Injury.** Plaintiff does not allege that he was entirely unable to speak during Probate proceedings. Plaintiff alleges that during a critical period of an active guardianship proceeding he lacked a reliable disability-accessible means to create, complete, and preserve an identifiable working court record of his substantive Opposition, supporting exhibits, and emergency filings.

**192. Material Consequence.** Plaintiff alleges that the access deprivation was material because the affected record contained evidence concerning his capacity, psychiatric status, wheelchair and DME dispute, substituted decision making, guardianship timing, and less restrictive alternatives and was being assembled to oppose a proceeding capable of restricting his liberty, medical autonomy, discharge, placement, and control of his affairs. (**Registry Exhibit B**.)

**193. Independent Federal Injury - Rooker-Feldman Does Not Bar This Claim.** Plaintiff does not ask this Court to review, reverse, vacate, or modify any Probate Court order or to determine whether the Probate Court's substantive guardianship rulings were correct. Plaintiff challenges independent administrative conduct involving access to filing, exhibit-intake, docketing, record-maintenance, counsel-status, and reasonable-modification services. Liability therefore does not depend upon this Court determining that any Probate judgment was substantively erroneous.

**194. Fundamental Court-Access Context.** Plaintiff alleges that the Title II violation occurred in the administration of state judicial services during a proceeding affecting fundamental interests in liberty and autonomy. This claim concerns meaningful access to those judicial services, consistent with the sovereign-immunity theory separately pleaded in the Jurisdiction section; it does not seek federal appellate review of a state-court judgment.

**195. Subsequent Dismissal Does Not Eliminate Completed Injury.** Plaintiff alleges that the later termination or dismissal of the guardianship did not retroactively provide the accessible filing and record services he alleges were denied while the proceeding remained active.

**196. Damages and Relief.** As a direct and proximate result of the alleged violation, Plaintiff alleges completed legal and practical injury and any proven legally compensable economic loss caused by the denial of meaningful access. Plaintiff seeks compensatory damages only to the extent legally recoverable and upon proof of intentional discrimination, together with nominal damages only where legally available and any other lawful relief. Plaintiff does not seek punitive damages under Title II or Section 504 and does not seek emotional-distress damages under Section 504. Plaintiff's commercial printing, mailing, and courier expenses incurred before his express accommodation request are pleaded primarily as evidence of the burden and ineffectiveness of the ordinary filing method and the necessity of an alternative modification, rather than as an independent damages category absent proof of legally sufficient causation. **(Registry Exhibits A, D, H, and P.)**

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Arthur Burnham respectfully requests that this Court enter judgment in his favor and grant the following relief:

**A.** Enter judgment in Plaintiff's favor on each claim for which Plaintiff establishes liability;

**B.** Award compensatory damages against Defendant UMass Memorial Medical Center, Inc. in an amount determined by the trier of fact, upon proof of intentional discrimination and only to the extent such damages are legally recoverable under Section 504 and proven to have been proximately caused by that Defendant's violations;

**C.** Award compensatory damages against Defendant Commonwealth of Massachusetts in an amount determined by the trier of fact, upon proof of intentional discrimination and only to the extent such damages are legally recoverable under Title II of the ADA and Section 504 and proven to have been proximately caused by the Commonwealth's violations;

**D.** Award nominal damages on any claim for which nominal damages are legally available;

**E.** Award Plaintiff his costs and any fees recoverable by law;

**F.** Award prejudgment and postjudgment interest as permitted by law; and

**G.** Grant such other and further relief as the Court determines is legally available and appropriate.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 7, 2026

Respectfully submitted,

/s/ Arthur Burnham
Arthur Burnham
Plaintiff Pro Se
CM/ECF E-Filer
(774) 757-8772
standupinfaith12@gmail.com

Date: November 7, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2026, a true and correct copy of the foregoing Verified Fourth Amended Complaint was filed through the Court's CM/ECF system, which will

send electronic notice of filing to all counsel of record, including counsel for Defendant UMass Memorial Medical Center, Inc. and counsel for Defendant Commonwealth of Massachusetts.

/s/ Arthur Burnham
Arthur Burnham
Plaintiff Pro Se
CM/ECF E-Filer
(774) 757-8772
standupinfaith12@gmail.com